The next case is number 05-1584, the United States v. Ford Motor Company. Now Mr. Cooper, it's your turn. Thank you very much Judge Newman, Judge Rader, Judge Garza, and may it please the court. I'd like to focus my argument this afternoon on the issue of Ford's reporting obligations at entry under 1484 and after entry under 1485 with respect to post-entry changes in the value of imported goods due to post-entry adjustments in price and assists. The Court of International Trade held that Ford had violated its reporting obligation at entry because it had not notated its entry documents that the values were not final or subject to change. That by itself violated 1484. It also held that Ford violated its after-entry reporting obligation by not reporting at once to customs the post-entry price adjustments that rendered the previously entered values inaccurate. You had a 60-day agreement, didn't you? You had to do it within 60 days? Your Honor, we had an agreement, a reconciliation agreement. Did you meet the 60 days? We did not, but we didn't have an agreement on 60 days, and I'd like to address that momentarily. But first I'd like to simply make the point that the judges, the CITs' rulings on these two points are at war with themselves. My point is this. First, if Ford had marked its entries not final or subject to change, customs would not have been able to liquidate them. It would have to leave them open until they were final. Second, we did, Judge Rader, have a reconciliation agreement that modified the at-once after-entry reporting obligation of 1485 as the Court held. And I'll come back to why the 60-day limitation wasn't part of that agreement. But my point is it was modified, and it was modified with a key term that customs insisted upon that the reconciliation agreement would apply only to liquidated entries. Only to liquidated entries. So the reconciliation agreement itself applied only to entries that were not marked not final or subject to change. That's the only entries it could apply to. That is, entries that were illegal under the Court of International Trade's judgment. And obviously customs didn't think that was a necessary requirement of 1484. Ford didn't think it was. And even more importantly here, this Court, in Hitachi, Judge Guijarza, rejected a penalty on precisely the same theory regarding the necessity of notating entry documents. That is being advanced here. And, Your Honor, we've quoted on page 24 of our blue brief the key language from Hitachi, but I think it bears repeating. It is not clear under section 1484 whether an escalation clause, which represents payments that are not definitively known at the time of importation, must be referred to at that time in order to disclose the price accurately. That's precisely the issue here. Here the Court went on in Hitachi to recognize that an earlier customs decision had actually cast doubt that that was the case because it said that notating it on the entry documents was the preferred practice. But nowhere did it say it was required. Here, Ford's case is stronger than Hitachi's was because we had this reconciliation agreement, Judge Rader, which negated the very entry document notation requirement because it applied only, again, to liquidated entries, those that were not marked, not final. Mr. Cooper, with respect to 1484, if in fact there's no duty and obligation to accurately state the prices, what obligation is there under 1484? Your Honor, there isn't a duty to accurately state the prices, but there isn't a duty to, as the Court held in Hitachi, to state that the price may change if it hasn't changed. If the price is what it is at the time of entry, but it is subject to change, the importer doesn't have to note that, or at least under Hitachi can't be penalized for not noting that because that obligation, if it exists, is not at all clear. And Hitachi said it would violate due process to penalize. I don't think it went that far as to say it violated due process. It was a violation of notice. There was insufficient notice at that point. And it rejected the argument that that was insufficient notice to customs of the accurate. Exactly. And, Your Honor, we were in the same situation. How do you correlate 1484, then, with 1485, the at-once language? Your Honor, that imposes upon the importer the after-entry obligation. When value now is known to be, the entered value is known to be inaccurate, that you must at-once report that to customs. The Court of International Trade quite correctly recognized that customs and an importer can agree to a modus vivendi for determining what at-once is. And we did here. But the court erroneously had— But the court finds specifically you had a 60-day obligation, and you didn't make that either. Yes, Your Honor. Let me address why we didn't have a 60-day obligation, Your Honor. With all due respect to the— So you think there's a clearly erroneous finding here by the trial court? Your Honor, that is an issue of contract interpretation. And I think that this court can examine that de novo. Okay. So, no, I have to get over that hump with the prior disclosure argument, but not—in the scope of the investigation, but not, I don't think, Your Honor, with respect to the construction of our agreement. The reason the 60-day time limit, which Ford proposed, was not part of the deal was that for the very reason I mentioned earlier. Customs came back and insisted that it only apply to liquidated entries. That on its face cannot be square. With a 60-day after the model year, that was the time frame, close of the model year, with that deadline, it can't be square. At the time, Customs was running typically a 90-day liquidation period. But it often, as this court knows, I am sure, Customs often takes longer than 90 days, and it has up to four years under certain circumstances, to liquidate enrollment. But they don't know whether to liquidate or not to start the process at all until they hear from you, right? They don't know the value. No, Your Honor. The whole point was they were going to go ahead and liquidate. They were going—they wanted to be able to liquidate. And Mr. Mann testified to this effect with respect to—he was on Customs' side and wrote the letter that Customs sent back insisting on liquidation. They needed to liquidate because of resource issues. His testimony is quite clear. They did not want to hold these open, and so they didn't want them marked as not final. That would be inconsistent with the whole approach. They wanted to go ahead and liquidate and have these annual reconciliations. But how can they do that until they have the final value? Your Honor— And so they're waiting for your 60-day obligation so they can get the final value so they can do it. Your Honor, they got the final value, and it is routine—it was a routine practice for them to simply accept the additional duties, as Mr. Mann's testimony quite explicitly explained, and put them in a separate account that did not go entry for entry relating those additional duties entry for entry, but rather in the aggregate. So, Your Honor, the 60-day requirement could not be squared with that reconciliation agreement or with the course of performance. We routinely reported after 60 days. In fact, only one of the 21 entries at issue here, two of the entries, were within 60 days. And before these entries and after these entries, Ford routinely submitted its reconciliation reports. Why didn't you propose 60 days then? Why didn't you propose 90 years, 120 years, whatever you needed to get the value? Well, the proposal was to apply to open and liquidated entries. That was the proposal. Customs came back and said, no, we've got a process in place for open entries. This will apply only to liquidated entries. When they insisted on applying only to liquidated entries, the 60-day provision no longer could work. And the course of performance under that agreement makes clear that neither party thought that the 60 days continued to bind. At a minimum, I want to stress— Was there a 60-day nonsensical requirement then raised below? I don't see any discussion of that 60-day requirement in the trial court's opinion. Your Honor, the argument was offered to the court that the 60-day provision that the court found could not— what was essentially rejected by Customs, it could not be squared. And the parties moved forward without the 60-day limit binding. That argument was made. And I don't recall the CIT addressing it. I don't recall seeing it in the CIT opinion. And I can't recall it either. But my point is the argument certainly was made as we're making here. In any event— With respect to the 60 days then, it was a choice of Ford to make it the 60 days, right? It was the proposal from Ford. And the testimony— In fact, Your Honor, I take it back. The court does address certainly the 60-day point. Yeah. Page 16. Yes. And recognizes that Ford testified that this was a target date, not a hard and fast rule. And that, again, it applied—at least the proposal was to apply to open entries and liquidated entries. And if within the 60-day period there had not been—the information was not available, it would be carried over to the next year. That, in fact, is how the parties have conducted themselves under this agreement. Because it is an open liquidation, essentially. Unliquidated aspects have to continue over a period of years, isn't it? They do, Your Honor. But these entries were not open. They had been liquidated. And that was based upon customs and systems. That this reconciliation process, where information after entry came forward and new values were known and new duties were owed, would be paid on liquidated entries, not open entries. And, again, that's the thing that's impossible to square with the— Let's hear from the government, and we'll continue with your rebuttal and the next case. I appreciate that, Your Honor. Mr. Levitt. Thank you, Your Honor. Your Honors, between 1987 and 1993, Ford made misrepresentations on entry records covering approximately $350 million worth of merchandise. In short, it was the government. Now, are you talking about cases that are not before us, or only this case? There is before you. This is Capri. Between 1987 and 1993, Ford made misrepresentations with respect to the price it paid for over $350 million worth of merchandise, and as a result of doing that, paid approximately $8.5 million less in duties than it should have paid. Mr. Cooper tells us that reconciliation applied only to the liquidated entries. The Ford recognized that when it had purchased contracts that allowed prices to change based on contingencies, that it might not know the final price it would pay until after the entry occurred. So it asked customs to forbear from applying 1485, which requires an at-once disclosure of new information, for a 60-day period after the model year was over, so that if there was additional payments in the course of the model year that occurred after entry, Ford didn't have to report it the day after it knew about it. It had until 60 days after the end of the model year to do that. The 60 days came from Ford as a result of a letter to customs saying, we sometimes need more time after we get this additional information until we have the 60 days. Customs wrote back and said, yes, we accept your proposal. We're applying it to liquidated entries only, because an entry that's not liquidated has to be, the information for an entry that's not liquidated has to be reported to the port in which the entry came into the country, because the accounting of customs required that port to register that payment. Any entry that was liquidated, but that required an additional payment by Ford, could be paid to Detroit, where Ford had its headquarters. Ford asked for that. Customs couldn't allow an unliquidated entry to be paid in Detroit, because the responsibility to pay was a responsibility in the port where the entry came, like Seattle or Los Angeles. The obligation of Ford with respect to an unliquidated entry was to report the additional information immediately. It didn't have within 60 days, because it had to go to the port where the entry came in and report that information immediately. But with respect to liquidated entries that came into Detroit, it did have the 60 days. Mr. Cooper points out that there was testimony at the trial that the 60 days didn't really mean 60 days. And that was Mr. Mann, who had worked for customs and then worked for Ford and testified on behalf of Ford. The trial judge said his testimony is not credible. Ford's letter proposed 60 days. Customs' response didn't change or alter the 60 days in any way, and therefore the agreement is 60 days. And those factual findings are at paragraph 25 of the trial judge's decision. And as you know, credibility determinations are effectively immune to review in this court, or at least the review is extremely limited. The bottom line is that what Ford didn't do, it knew it should have done, because it had done it with respect to some other entries that aren't involved in this case. And what it knew it should have done, unlike in Hitachi, where there was a question whether the importer knew it and had a requirement to do it, in this case, Ford admitted at trial that it knew that when it had a supply agreement that had a contingency clause, that contingency clause was material to the liquidation of that merchandise. And under 1484, by its explicit terms, any information that's material to the liquidation of the merchandise must be reported at entry. Ford simply did not do that with these entries, though it did it with other entries, particularly with respect to tooling. These entries involved whole automobiles and automobile parts, but there are other entries in the record involving tooling. And with respect to those entries, Ford did on occasion, though not consistently, report the escalation clauses. Hitachi is clear that an escalation clause is material. It's within 1484. It's not explicit, it's implicit. If an importer, as was the case in Hitachi, can point to some contrary ruling or opinion of customs that he can plausibly say confused them, as the Hitachi importer did, it's arguable in a situation like that a court might want to say that importer shouldn't be penalized. There was no clouding of the obligation here, because Ford conceded in the case in the trial court that it well knew it had a responsibility to report escalation clauses in entry records. With respect to 1485— Excuse me, counsel, but Hitachi does not go to that far, does it? It does mention that escalation clauses are not stated precisely in 1484. Right, but it does explicitly affirm the trial court's judgment that an escalation clause is a material term to state to customs when you're bringing merchandise in. Well, it is a material term, but it's not stated in the statute. I think this court's language on it suggests two things. The first thing it suggests is that it's implicit in 1484, that the obligation to report an escalation clause is implicit in 1484. And the reason I think this court's opinion says that is because this court affirmed the trial judge on that issue of whether an escalation clause is material. It could not have affirmed the trial judge unless it had found that 1484 implicitly contained that requirement. It's common sense anyway, because as you pointed out in your question to Mr. Cooper, if without knowing of the escalation clause, customs is going to liquidate on the basis of the asserted price, because it doesn't know it should hold off until the importer re-reports changes in the price, it would result in closed liquidations which would be inaccurate, which is what happened here. We had $8.5 million or $7.5 million—$8.5 million worth of unpaid duty over five years because Ford told customs that's the price even though it knew that wasn't the price. Are you requesting this court then to essentially read into 1484 a duty and obligation on the importer to report all escalation clauses? Yes. Our position is that that's consistent with what you've done in Hitachi, and it should be reaffirmed here. That's an extension of Hitachi, though. Well, if you want to call—I mean, Hitachi clearly—this court's opinion of Hitachi clearly upheld a trial judge who said that clause was material. But it wasn't as explicit a statement from this court about the scope of 1484 as would be beneficial to the bar, so it would be good to restate it. But we read Hitachi as this court having suggested that it's at least implicit in 1484. It would be better to make it explicit because then there would be no clouding by any importer. But whether you do or you don't, there was no clouding over Ford here because Ford conceded in the trial court that it knew its obligation was to report those clauses. Does that create a due process problem then? No court has ever said that 1484 is unconstitutionally vague or unfair to people not knowing what it contains. And indeed, contrary-wise, Ford admitted in the trial court it did know what it contained. So I don't think there's a due process problem with 1484. You're saying there's no space between, let's say, an innocent or casual mistake and negligence and something more extreme. It doesn't have to be a constitutional violation in terms of what an appropriate process might be. That is the government's theory that because an error was made, it is by definition negligence? It's by definition a violation of 1484, but 1592 requires more than that. And such a violation is by definition, then, you say negligence? No, I think the government, once it shows a violation, has satisfied a prima facie obligation before the trial court. A prima facie negligence. Yes. That's what I was asking. So there's no room in your theory for a mistake to have been made that was other than negligence? There is room for the importer to say it was an honest mistake. And if the importer can prove that and overcome the presumption of negligence from the fact of the violation, then a penalty is unavailable. The statute explicitly has that in it. In other words, for negligence. Yes, that's the issue. At what stage, in your view, did Ford's behavior cross over into being prima facie and irrebuttable, in fact, negligence? We don't say it was irrebuttable. We say the proof was in the trial court that the entry records did not contain information about the escalation clauses. Well, that's the theory. That was a prima facie violation. It was a prima facie mistake. I'm trying to figure out whether your theory is that a prima facie mistake is also a prima facie negligence. The statute says that. A prima facie mistake. A violation of 1484, if proven as a misrepresentation, is a prima facie violation. So misrepresentation by itself has implications of deliberateness. Well, there can be innocent misrepresentations. The government doesn't dispute that. And if the importer can prove that it was a clerical error or some kind of innocent bookkeeping error or some such, it's available under the statute to rebut the prima facie showing negligence. Really, this is the area in which I'm trying to understand. That in your view, an error was made. Unless it's a clerical error, it is then by definition negligence or prima facie beyond. But you say it's rebuttable. But you say you can rebut it only by showing it was a clerical error. You say you can't rebut it by saying, well, I made a mistake, I'm sorry. You can't rebut it by saying, I made a mistake, I'm sorry. If you can show you had systems in place that were very highly sophisticated systems and a new employee didn't understand the systems and it slipped through his hands, presumably you could say it's a misrepresentation, it's a violation of 1592, but we've successfully rebutted negligence. But this case doesn't bother me like that. The trial court found facts that didn't indicate a sophisticated entry system. It indicated the contrary, and that's why he imposed a fairly substantial penalty. It indicated that there were mistakes all over the place over a five-year period covering $350 million worth of goods where Ford didn't have a compliance manual that was explicit on what its brokers ought to do. It half the time couldn't control its purchasing department to tell us the customs department within Ford what to advise the broker to state on the entry records. The opinion of the trial court is replete with the evidence that we presented over a two-week trial about how there were holes in the entry system for the product. That's why so much came in without the representations being accurate. Mr. Levitt, could I ask a question about a slightly different subject? Sure. That 1592 says if there was a prior disclosure before the investigation was commenced or known, they're off the hook. There's a lesser penalty. Why doesn't that apply to all the 1992 and thereafter models, particularly since the trial court found that model 1992 and thereafter were not within the scope of the investigation? Our position on the issue is that when the meeting occurred in 1991 where customs told Ford that there was an investigation, an ongoing investigation… But we've got a finding here. That was not within the scope of the customs investigation. Doesn't that close us down? What the judge is saying, in our opinion, in that finding is that when customs announced to Ford in June of 1991 that it was investigating all its entries, it could not by definition have been investigating entries that hadn't entered yet. In other words, a May 1992 entry could not be spoken of in May 1991. But in other elements of the judge's opinion, he recognizes that Ford was aware that customs was not simply becoming static and only looking at pre-June 1991 entries. That as the investigation continued to later months, later month entries would be subsumed within the investigation, and Ford understood that. And because it understood that, it was not available to Ford to make a prior disclosure, because a prior disclosure is only valid when there either is not an investigation ongoing, and in this case there was, or there is one ongoing, but the importer is not aware of it. Here, the importer was aware of it, and that's indicated by the fact that when Ford made its tenders, which it called prior disclosures, but which weren't prior disclosures because it was aware of the investigation, it included 1992 and 1993 entries. It wouldn't have done that if it didn't understand the investigation was subsumed. You're asking us to make quite a few suppositions here, aren't you? There's really one. Think about the position of Ford, though. Ford is saying that when customs announced the investigation on a certain date, by definition, Ford could not have been aware of a… Because the investigation was essentially for things before 1991, it's at least debatable that later disclosures were not prior disclosures. Well, there were also summonses in 1992. There were summonses for Fiesta vehicles and there were summonses for show engines. Those summonses asked for documents, any documents through the time Ford responded to the summons, which happened to be in September of 1992. So Ford was apprised by those summonses, in addition to what it was apprised of during the meeting in June of 1991, that the investigation was covering entries after June of 1991. There was also a summons for British-made engines in 1993. Ford was aware from that summons that the investigation was ongoing to cover entries beyond entries prior to May of 1991. But as a policy issue, there's sort of a… So even if you look narrowly at it and just ask, were there additional… The customs zone agent said this doesn't apply to 1992 models, right? Testified? He said that at the time he told them at the meeting in June of 1991… It doesn't apply. It only applies to entries up to now, because he didn't know that there were entries. That's kind of what I said. But then the issue is, should Ford, as a reasonable, and indeed more than reasonable, largest or second largest importer or customer of customs, have understood that if they're looking at the broad range of Ford's programs and an investigation takes time, naturally if another entry comes in, it's subject to the same investigation. Of course they understood that. And it's clear they understood it because they contacted customs after May of 1991 to say, we would like to make a disclosure of additional entries, because they knew customs was investigating those entries. In addition, the tribe… I'm not sure that's an of course. I would think I would trust the government's agents to tell me what they were doing, and I'd rely on that a little, wouldn't I? Well, there were additional things customs did that would solidify the common sense understanding that an investigation isn't frozen on entries that preceded the date it was announced, and those were the issuance of summonses. How much are we talking about here? If the court finds that there were prior disclosures here, the penalty ought to be recalculated. What are we talking about, to account for the 92 cutoff that appears to be in the trial court's findings? Can you give me just a ballpark? I'm not asking for… There's a difference between a prior disclosure penalty and a real penalty. That's only interest on the unpaid duties. There was not a presentation at the trial. We haven't had an expert to do that. So we'd have to go back and check it. I apologize. Sorry. I don't know. The trial judge said that when Ford learned of the investigation, it went back and looked at all of its entries to try to advise customs as a prior disclosure on entries that may have had misrepresentations attached to them. And when Ford did that, which it called internal reconciliations, it did it for not only pre-June 91 entries, but entries going out to 93 and beyond that. So, you know, I think that that statement you pointed to the trial judge raises an issue. It's correct. But if you think about the other evidence and other statements made by the trial judge, I think you'll see that it's not a strong position that they didn't know about post-June 91 entries because the evidence is replete that they did. Okay. Thank you. Thank you very much. Thank you, Mr. Levitt. Mr. Cooper, would you enlarge Mr. Cooper's time by the amount we've run over? Thank you very much, Judge Newman. I'd like to invite the court's attention to page of the appendix, page A20233, where customs responds to the proposal for reconciliation. 20233. That's where customs approves the proposal with the modifications with the following modification. This policy applies to withheld duties on entry summaries which have been liquidated. Now, counsel acknowledges that they applied only to liquidate it, not to open non-final entries. He never addresses my point that this can't be squared with a 60-day time agreement. It simply can't be squared. Nor does he address the course of dealing under this very agreement where customs routinely accepted the routine later than 60-day reconciliation reports and duty tenders, routinely without once objecting, not one complaint, until this case was filed. Never addresses that point either. Judge Newman, in the light of those circumstances, your point seems to me to be dispositive. Even if there's this 60-day technical requirement, Ford can't be held as negligent under these circumstances for not grasping that and for not abiding by that. Your Honor, it seems to me that the CIT has taken an uncertain contractual requirement and turned it into a strict liability mandate for which no defense and no explanation will suffice if these explanations and these procedures are not followed. But didn't they give you a chance to explain and to give your explanation and the court found it still wanting? The court cited one thing, Your Honor, our proposal. It said 60 days. Did not go beyond that. That was it. That was it. And, Your Honor, all these other propositions, we would submit overwhelm that proposal. Do you think you had an obligation to clarify these ambiguities and to make sure that you were, as a sophisticated importer, properly accounting for your disclosure requirements? Well, Your Honor, I don't think to the extent that there was ambiguity and the parties just weren't on the same wavelength, notwithstanding the course of performance. Your Honor, perhaps we should have perceived that, but we didn't and should have taken some steps to clarify things. But my proposition to the court is that failure can't be viewed as negligence, particularly in light of all the sophisticated compliance, which the court credited to its credit, the compliance efforts that Ford undertakes. I want to make one point about attention. Mr. Cooper, should we extend the issue of 1484 and require the importer, impose a duty upon the importer as a positive obligation, as an interpretation of 1484? Your Honor, I am fine with it if you do that. But you can't hold Ford liable for somehow perceiving that that would be this court's ruling and abiding by it before it ever got here, particularly in light of Hitachi, which said in the sentence after the ones I just quoted, Therefore, we hold the Court of International Trade properly refused to penalize the importer for failing to disclose the escalation clause on entry documents because to do so would result in a violation of the importer's right to due process. We were in precisely the same shoes as Hitachi. The same statutory and regulatory regime governed us. It was during the same, effectively, period of time. And the result can't be different for Hitachi and for Ford, even if this court wants to clarify it going forward and say there's an ironclad, no excuses requirement to disclose this under 1484 entry documents. I don't think that would make sense because it would handcuff importers and customs from entering into agreements just like this one, which are in both sides' interests. My time has expired. Yeah, it's on the far side of it. I was confused. Thank you. Okay, thank you. Thank you, Mr. Cooper and Mr. Levitt. That takes care of number 1584.